**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Criminal No. 05-20080-03-KHV |
| ) | |
| **ERIN HARMON,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**MEMORANDUM AND ORDER**

On June 22, 2005, a grand jury returned a 13-count indictment against five defendants.[1]  See Indictment (Doc. #1-2).  The indictment charged Erin Harmon with conspiring to distribute cocaine base ("crack cocaine"), possession with intent to distribute crack cocaine and maintaining a place for the purpose of distributing controlled substances (Count 1); conspiracy to conduct money laundering (Count 11); and four counts of money laundering and attempted money laundering (Counts 13-16).[2]

---

[1]   The indictment named as defendants Darren Wilburn, Evann Hardy, Erin Harmon, Lamar Johnson and Robert Robinson a.k.a. Cowboy.

[2]   The indictment alleged the following as to Harmon:

Count 1: From May 2001 to June 3, 2005, in violation of 21 U.S.C. § 846, with reference to 21 U.S.C. § 841(b)(1)(A)(iii), conspiring to (1) distribute more than 50 grams or more of a mixture and substance containing cocaine base ("crack cocaine") in violation of 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1); and (3) leasing, renting, using and maintaining a place for the purpose of distributing and using controlled substances in violation of 21 U.S.C. § 856(a)(1).

Count 11: From May 2001 to June 3, 2005, conspiring to conduct and attempt to conduct financial transactions affecting interstate

(continued...)

This matter is before the Court on Defendant's Motion[s] To Dismiss Count 13 Of The Indictment, To Strike Certain Allegations From The Indictment, And To Suppress Evidence (Docs. #42 and #50) filed September 6, 2005. For reasons set forth below, the Court overrules defendant's motions.

**I.     Motion To Dismiss Count 13**

Count 13 alleges that on July 11, 2004, defendant and co-defendant Darren Wilburn used $2,000 in proceeds from unlawful activity to purchase a 1987 Chevrolet Monte Carlo from a private individual in Lawrence, Kansas, and that they designed the transaction to conceal and disguise the nature, location, source, ownership and control of the proceeds of said unlawful activity. Count 11 asserts that Wilburn instructed defendant to purchase the automobile and gave her cash for the transaction, and that defendant titled and registered the vehicle in her name.

---

²(...continued)
commerce which involved proceeds of specified unlawful activity – i.e. conspiracy to distribute and possess with intent to distribute crack cocaine, distribution and possession with intent to distribute crack cocaine and maintaining a place for the manufacture, distribution and use of controlled substances – knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds in violation of 18 U.S.C. § 1956(h).

Counts 13-16: Conducting and attempting to conduct specific financial transactions affecting interstate commerce which involved proceeds of specified unlawful activity (listed above) knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said unlawful activity in violation of 18 U.S.C. § 2 and 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

See Indictment (Doc. #1-2) filed June 22, 2005.

Defendant asserts that this charge has no factual basis. Specifically, she asserts that she did not purchase the Monte Carlo – that a co-defendant purchased the vehicle, then asked defendant to register the car in her name. Defendant insists that she had nothing to do with the purchase. The government counters that documents from the title history indicate that defendant purchased the car from Quality Tow in July of 2004 and registered it with the Douglas County Treasurer's office on October 14, 2004.[3]

To convict defendant under Count 13, the government must prove beyond a reasonable doubt the following elements:

> (1) that defendant engaged in a financial transaction; (2) that defendant knew that the property involved in that transaction represented the proceeds of unlawful activities; (3) that the property involved was in fact the proceeds of that criminal enterprise; and (4) that defendant knew that "the transaction [was] designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control" of the proceeds of the specified unlawful activities. 18 U.S.C. § 1956(a)(1)(B)(i).

U.S. v. Garcia-Emanuel, 14 F.3d 1469, 1473 (10th Cir. 1994).

In ruling on a motion to dismiss, the Court looks solely to the allegations on the face of the indictment and accepts such allegations as true. See United States v. Reitmeyer, 356 F.3d 1313, 1317-18 (10th Cir. 2004). Defendant challenges the facts, which must be determined at trial. See United States v. Kilpatrick, 821 F.2d 1456, 1462 n.4 (10th Cir. 1987). The Court therefore overrules defendant's motion to dismiss Count 13.

## II.  Motion To Strike Certain Allegations From Indictment

Defendant asserts that to the extent the indictment charges that defendant used proceeds

---

[3] The government states that the purchase price was $1,200, not $2,000 as charged, and that a superceding indictment is probably necessary to correct the error.

from (1) conspiracy and (2) possession with intent to distribute crack cocaine, it fails to state a claim. Defendant's Motion at 2. Specifically, defendant maintains that it is factually impossible to obtain funds as a result of conspiracy to distribute or possession with intent to distribute. Id. at 3. She also asserts that the underlying crimes must have been completed before the money laundering offense. Defendant asks the Court to strike allegations in the money laundering counts (11, 13-16) regarding "using the proceeds of conspiracy to distribute cocaine base, conspiracy to possess with intent to distribute cocaine base, and possession with intent to distribute cocaine base." Id. With the proposed revision, the money laundering counts would charge only that defendant used proceeds obtained from distribution of cocaine base.

As to the motion to strike allegations regarding proceeds obtained from conspiracy to distribute, defendant's motion lacks merit. As a member of the alleged conspiracy, defendant is responsible for proceeds obtained from the conspiracy. Nothing requires that she obtained the proceeds directly from her own distribution of cocaine base.

As to possession with intent to distribute and conspiracy to possess with intent to distribute, defendant cites Tenth Circuit cases which state that Congress intended the money laundering statute to separately punish a defendant – without violating the double jeopardy clause – for monetary transactions that follow in time the specified unlawful activity that generated the criminally derived property in the first place. See United States v. Lovett, 964 F.2d 1029, 1042 (10th Cir. 1992); United States v. Edgmon, 952 F.2d 1206, 1214 (10th Cir. 1991). These cases do not hold that the underlying crime must be completely over, however, before the money laundering statute applies. Id. The government maintains that "there are incidents when drugs are fronted to individuals and payments are made later or when money must be given before the drugs are provided to the purchaser."

4

Response To Defendant's Motion To Dismiss Count 13, To Strike Certain Allegations, And To Suppress Evidence ("Government's Response") (Doc. #47) filed September 16, 2005 at 12. The government does not state whether such evidence exists in this case. Defendant may be entitled to a directed verdict on some of the allegations at trial, but to strike the allegations before trial would be premature. The Court therefore overrules defendant's motion to strike.

### III.   Motion To Suppress

### A.   Facts

On October 25, 2005, the Court conducted an evidentiary hearing. The government presented testimony by Detective Mike McAtee and Officer Tarik Khatib, of the Police Department of Lawrence, Kansas. Defendant presented the testimony of her father, Mike Harmon. To the extent that the testimony of McAtee or Khatib contradicts that of Harmon, the Court credits the testimony of McAtee and Khatib.[4]

McAtee testified that in late 2004, he began investigating drug-related criminal activity by Wilburn. On February 24, 2005, he helped execute a search warrant of 2709 Ponderosa, a residence leased by Evann Hardy. During the search, officers seized crack cocaine and a firearm. The drugs did not have the drug stamp required by Kansas law, and the Kansas Department of Revenue therefore issued a tax warrant for $8,000 in a bank account owned by Wilburn and Hardy. When the bank did not immediately honor the tax warrant, Wilburn and/or Hardy withdrew all of the money from the bank account.

---

[4]   Because Harmon is a captain in the Lawrence police department and because he is defendant's father, he has obvious interests in this matter. For this reason, and because of clear inconsistencies in his testimony, his testimony is not altogether persuasive.

Detectives engaged in surveillance of Wilburn and determined that he sometimes stayed at defendant's residence at 3234 Glacier Drive. Officers searched defendant's trash and found evidence of drug trafficking. Based on the surveillance, interviews and trash searches, officers obtained an arrest warrant for Wilburn and search warrants for the residences of defendant and Hardy.

On June 3, 2005, officers arrested Wilburn. They then executed the search warrant for Hardy's residence while McAtee and Officer Sean Brown watched defendant's residence. Brown radioed McAtee that a white female had parked her car and walked up to the front door. McAtee approached the woman and learned that she was Christina Krusemark. Krusemark said that she was there to check on defendant's dogs. McAtee showed Krusemark the search warrant, and she unlocked the door for him. After they entered the residence, defendant called Krusemark on her cell phone. McAtee spoke with defendant on Krusemark's cell phone, told her about the search warrant and asked her to come home. Defendant asked McAtee if she could call her father, who is a captain in the Lawrence police department, and McAtee said that it was up to her.

Just before 10:00 p.m., defendant arrived at her residence. Her parents, Kevin and Cindy Harmon, arrived shortly thereafter. McAtee escorted defendant and her parents into the kitchen, where they all sat down at a table. McAtee told them that Wilburn, defendant's boyfriend, had been arrested and that the officers were executing a search warrant on defendant's residence. Defendant told McAtee that she wanted to fully cooperate with the investigation, but that she would like to have a lawyer at any interview. At that point, Brown or Khatib told McAtee that they had found a safe. Defendant said that she had the combination, and went into the other room to open the safe. Although Khatib found some cash in the safe, it was not the large amount from the bank account which the officers had expected to find. Khatib then spoke privately with McAtee and told him that

6

a Detective Bonham (first name unknown) had called after executing the search warrant at Hardy's residence and said that if they did not find the cash in the safe, it would most likely be in defendant's cubicle at the Kansas Social and Rehabilitation Services ("SRS") building, where she worked.[5]

McAtee went back to the kitchen and told defendant and her parents that the detectives believed that a large sum of cash was somewhere. McAtee asked defendant if she would consent to a search of her desk at the SRS building. McAtee explained that he needed her consent and that if she refused, he would have to apply for a search warrant "which may or may not be issued by the Court."[6] McAtee also told defendant that in his opinion a court would issue the search warrant because the officers had "an enormous amount of probable cause" to believe that the cash would

---

[5] According to Khatib, Bonham told him that in April of 2005, Hardy told him that she had withdrawn $8,000 from a joint bank account and given it to Wilburn in February of 2005. Hardy told Bonham that Wilburn said he was going to keep the cash in a safe at defendant's residence or place of work. While Khatib was at defendant's residence during the search on June 3, 2005, Bonham called him and told him that he had talked with Hardy about the safe. Bonham told Khatib that if officers did not find a large amount of money in the safe at defendant's residence, the money would probably be at defendant's work. Khatib then told McAtee about Bonham's call, and McAtee asked defendant for permission to search her workplace. Khatib testified that "there was some talk about getting a search warrant and what – you know, constituted that."

[6] According to Harmon, McAtee told them that he could get a warrant to search defendant's office and that defendant probably should do the right thing. Harmon testified that he was shocked when McAtee said that he could get a search warrant, because that is "not what I know the case law to be." Harmon testified that he should have interjected about his reaction, but he did not because "I felt like I was at jeopardy myself." McAtee also told defendant that if he had to get a search warrant, defendant's supervisor would be involved and that it would be embarrassing because they would probably serve the warrant on a Monday morning in front of defendant's coworkers. At some point, McAtee left the kitchen for a while so that defendant could talk with her parents. Defendant told Harmon that she felt that she had no choice in the matter, and that she had to consent. Harmon told her that everyone has choices, but that he could not advise her one way or the other for fear of interfering with the criminal case.

7

be stored in defendant's desk.[7]

When McAtee asked defendant for consent to search her desk at work, he told her that if officers had to get a search warrant, they would have to get a supervisor to open the building. Defendant asked to speak with her father, and McAtee stepped out of the kitchen. When McAtee returned, defendant told him that she would allow him to search her desk at work. After defendant consented, she made the unsolicited comment that Wilburn had placed something in her desk and that she did not know what it was.

After McAtee, Khatib and Brown finished searching defendant's residence, defendant and her parents drove to meet the officers at the SRS building. When defendant and her parents arrived at the SRS parking lot in their own separate vehicle, defendant signed a form giving consent to search her work space. While they entered the building and began the search, McAtee and Khatib asked defendant numerous questions about who had access to the building, her cubicle and her desk.[8] Defendant again made the unsolicited statement that Wilburn had placed an item in her desk and that

---

[7] McAtee based that belief on Khatib's statement that Bonham had information that the money might be at defendant's office, as well as all of the circumstances of the ongoing investigation. McAtee testified that Hardy was one of the cooperating individuals in the investigation, and that others had corroborated information which she provided during the investigation. Hardy had told investigators that Wilburn kept large sums of cash in a safe, and that the safe might be at defendant's home. Based on all of the circumstances, McAtee believed he had probable cause to get a search warrant for defendant's work place. Even before June 3, 2005, Hardy had told officers that money or a safe might be at defendant's workplace. In fact, the affidavits for the applications for the June 3 search warrants contain that information, which Hardy gave in an interview on April 27, 2005. See Ex. 401, 402.

[8] When asked whether defendant's consent to the search was voluntary, Harmon testified that "[e]very time you use the term voluntary, I have a different opinion as to whether or not how voluntary the entire episode is." Harmon testified that no one threatened defendant. He also testified that he did not tell his daughter not to give consent because he was afraid.

she did not know what it was. Defendant unlocked her desk drawer and filing cabinet. McAtee looked in the bottom drawer behind some files and saw a brown paper sack. McAtee reached inside the sack and pulled out several bundles of cash totaling $11,000.

**B.     Analysis**

Defendant maintains that she did not voluntarily consent to the search of her desk at the SRS office. She contends that the officers had no reasonable basis to believe that evidentiary items were located at her workplace and that McAtee had no good faith basis for stating that he could obtain a search warrant for her office. She contends that McAtee's claim that he would obtain a warrant amounts to trickery and deception which was designed to coerce her consent. Defendant also maintains that the Court should suppress her statements about the paper sack because she made them as a result of persistent questioning by McAtee after she had asserted her right to remain silent.

1.     Search Of Defendant's Workplace

To determine whether consent is voluntary, the Court must look to the totality of the circumstances. Relevant factors include physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and defendant's physical and mental condition and capacity. United States v. Glover, 104 F.3d 1570, 1583-84 (10th Cir. 1997). To admit evidence obtained during a consent search, the government must "produce clear and positive testimony that the consent was unequivocal, specific, and freely given" and also show a lack of duress or coercion. Id. at 1584.

Defendant maintains that McAtee's statement that he would obtain a search warrant for the office was coercive. According to McAtee, however, he merely said that he would apply for a warrant. The government asserts that even if McAtee stated unequivocally that he would get a

9

warrant, such a statement by itself does not render the consent involuntary. See United States v. Salvo, 133 F.3d 943, 954 (6th Cir. 1998) (consent not tainted by agent's statements that he would obtain warrant if defendant did not consent to search); see also United States v. White, 979 F.2d 539, 542 (7th Cir. 1992) (when expressed intent to obtain warrant is genuine and not merely pretext to induce submission, it does not vitiate consent); United States v. Kaplan, 895 F.2d 618, 622 (9th Cir. 1990) (consent not likely to be invalid where officer tells defendant that he can obtain search warrant if officer has probable cause on which warrant could issue); United States v. Blanco, 844 F.2d 344, 351 (6th Cir. 1988) (consent voluntary even though investigator told suspect that if he refused to sign consent, he would attempt to secure search warrant).

McAtee testified that before he asked defendant for consent, he believed that he had sufficient information to obtain a search warrant. The record contains no evidence that McAtee's statement about the search warrant was baseless or a pretext to coerce defendant, and it does not render defendant's consent involuntary. See United States v. Creech, No. 99-3205, 2000 WL 1014868 (10th Cir. July 24, 2000) (where some facts support application for search warrant, officer's expressed intention to seek search warrant in absence of consent does not render consent involuntary). Defendant understood that she had a right to refuse consent. Further, McAtee's statement was justifiable in the circumstances. A search of defendant's residence had uncovered a safe, and a reliable informant had told the officers that Wilburn had given defendant cash to hide in a safe. The safe did not contain the large sum of money which Wilburn sought to hide, and the informant told officers that if the money was not at defendant's residence, it would likely be at her workplace. Furthermore, during the search, officers had found drug paraphernalia and documents which implicated defendant in drug transactions. The record does not support defendant's claim that

McAtee's statement about the search warrant was baseless or a pretext to obtain her consent.

Defendant also asserts that her consent was coerced because McAtee told her that if a search warrant was required, officers would execute it in front of her co-workers and supervisor and cause defendant great embarrassment. Even if true, however, such a statement standing alone would not render defendant's consent involuntary. Given the other circumstances surrounding the search – defendant's freedom of movement, ability to speak privately with her parents before giving consent, and signature of a written consent form – the Court finds that the government has established that defendant's consent was not procured through duress or coercion. See United States v. Hernandez, 93 F.3d 1493, 1499 (10th Cir. 1996). In fact, the government has produced clear and positive testimony that defendant's consent was unequivocal, specific and freely given.

2.  Defendant's Statements

Defendant also seeks to suppress her statements that Wilburn had given her something to put in her desk but she that did not know what it was. Defendant asserts that she made these statements in response to McAtee's questions after she had invoked her right to speak with an attorney. See Edwards v. Arizona, 451 U.S. 477, 484-86 (1981) (accused who expressed desire to deal with police only through counsel should not be subject to further interrogation unless accused initiates further communication, exchanges or conversations with police). The government asserts that McAtee did not question defendant other than to ask for consent to search her desk at SRS and to ascertain that the areas searched were within her control. Indeed, the record includes no evidence that other than to seek defendant's consent to search and determine that she had control over her work area so that she could consent to a search of it, McAtee or other officers questioned defendant. United States v. McCurdy, 40 F.3d 1111, 1118 (10th Cir. 1994) (request to search not interrogation

11

which implicates Miranda rights); see also United States v. McClellan, 165 F.3d 535, 544 (7th Cir. 1999) (consent to search not incriminating statement; request to search does not amount to interrogation). Defendant's statements that Wilburn had placed something in her desk were not in response to questions by officers. Defendant voluntarily initiated these statements about what was in her work area, and the Court finds that they should not be suppressed.

**IT IS THEREFORE ORDERED THAT** Defendant's Motion[s] To Dismiss Count 13 Of The Indictment, To Strike Certain Allegations From The Indictment, And To Suppress Evidence (Docs. #42 and #50) filed September 6, 2005 be and hereby are **OVERRULED**.

Dated this 6th day of January, 2006, at Kansas City, Kansas.

                                            Kathryn H. Vratil`
                                            Kathryn H. Vratil
                                            United States District Judge